**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **No. CV 08-077-PHX-DGC (CRP)** |
| **Plaintiff,** ) | |
| ) | **No. CR 03-974-PHX-DGC** |
| **vs.** ) | |
| ) | **REPORT & RECOMMENDATION** |
| ) | |
| **NEIL RUSTY BOND,** ) | |
| ) | |
| **Movant/Defendant.** ) | |
| _____ ) | |

In 2005, Movant Neil Rusty Bond ("Movant") was convicted of theft of government property and Social Security fraud. (Doc 30, p 11; RT 3/11/05 123). In May 2008, Movant filed his amended petition for habeas corpus pursuant to 28 U.S.C. § 2255 ("habeas petition"), asking the Court to vacate, set aside, or correct his sentence. (*See* Doc 303 in criminal case cr-03-974-DGC). Movant alleged seven grounds for relief with numerous subclaims in his amended petition. The Magistrate Judge previously recommended that all of the grounds except ineffective assistance of trial counsel be denied. (*See* Docs 51, 83). On the claim of ineffective assistance of trial counsel, the Magistrate Judge appointed counsel for Movant, ordered supplemental briefing, and held an evidentiary hearing. (*See* Docs 98, 148, 172, 173). For the reasons set forth below, the Magistrate Judge recommends that the District Court, after its independent review, **GRANT IN PART** and **DENY IN PART** Movant's ineffective assistance of trial counsel claim.

**Factual and Procedural Background**

The following facts were established through the briefing of counsel, the two-day evidentiary hearing, and this Court's review of the trial transcripts. Movant began receiving social security disability after an automobile accident in 1990 left him with a head injury. (RT 3/9/05 59, 66-67). Beginning in 1996 the Social Security Administration ("SSA") received a couple reports of Movant working. Based on those reports it initiated an investigation and eventually determined Movant was working more than permitted and was no longer entitled to benefits. The SSA also requested its investigative agency, the Office of the Inspector General ("OIG"), look into Movant's case. The OIG determined Movant had defrauded the government by accepting more than $100,000 in disability while he was gainfully employed.

Based on the OIG investigation, the Government charged Movant with theft of government money or property in violation of 18 U.S.C. § 641 and social security fraud in violation of federal law. (RT 3/11/05 48-49). For the first count, the Government had to prove (1) that defendant stole money or property of value with the intention of depriving the owner of the use or benefit of the money or property; (2) the money or property belonged to the United States; (3) the value of the money or property was more than $1000. (RT 3/11/05 49). For the second count, the Government needed to prove (1) defendant had knowledge of an event affecting his right to receive or to continue to receive social security disability insurance benefit payments; (2) defendant knowingly concealed or failed to disclose this event to the Social Security Administration; (3) defendant concealed or failed to disclose this evidence to the Social Security Administration with the intent to fraudulently secure payment of social security income benefits in an amount greater than was due him, or when no payment to him was due him or when no payment to him was authorized. (RT 3/11/05 49-50).

*Trial*

At trial, the Government began its prosecution by explaining the SSA's disability program, including eligibility requirements. The Government presented this information

through the testimony of a social security disability expert, Barbara Jackson.  (RT 3/1/05 126).  Ms. Jackson explained that a person and any dependents are eligible for social security disability benefits if the person has an impairment lasting at least twelve months that prevents him from performing "substantial gainful activity."  (RT 3/1/05 132-133).  "Substantial gainful activity" is (1) receiving monthly a gross wage exceeding an amount determined by the SSA or (2) if self-employed, earning monthly net income exceeding the amount determined by SSA or working 40 hours or more a month.  (RT 3/1/05 133).  From 1990 to June 1999, substantial gainful activity was identified as net profit over $500 a month for a self-employed person or work over 40 hours a month.  (RT 3/1/05 133).  In July 1999 through 2000, substantial gainful activity was defined as $700 a month; it was $740 a month in 2001 and $780 a month in 2002.  (RT 3/1/05 134-136).  In all of those years the hour limitation was 40 hours of work a month.  (RT 3/2/05 73-74).  Thus, if a person has an impairment recognized by the SSA and does not earn substantial gainful activity, he can be eligible for disability benefits.

Ms. Jackson next explained how a beneficiary can lose his eligibility.  A person receiving disability benefits can become ineligible to receive those benefits if the person makes too much money or works too many hours in a given time frame.  As Ms. Jackson explained, beneficiaries do not immediately lose their disability benefits if they begin earning too much money or working too many hours.  The SSA slowly phases out a beneficiary's eligibility, providing the beneficiary with a cushion of time in which the beneficiary can still receive benefits but also attempt, sometimes successfully, to go back to work.  (RT 3/1/05 131).  This cushion of time in which the beneficiary can still receive benefits and work is called the "trial work period".

The trial work period consists of any nine months over a sixty month period when a beneficiary receives benefits but makes over a predetermined amount of money or works more than 40 hours a week.  (RT 3/1/05 131); *see also* 42 U.S.C. § 422.  For a self-employed person, the predetermined limit on the amount of money a beneficiary could earn was $200 a month in the years of 1990 to 2000.  Thus, if a beneficiary earned $200 or more in a given

month that month would be counted as one month in the trial work period. (RT 3/1/05 132). In 2001, the predetermined limit was raised to $530 and in 2002 it was $540. (RT 3/1/05 137).

After a beneficiary has exhausted his nine months of trial work in a sixty month period, the SSA permits an "extended period for eligibility" in which a beneficiary can still receive benefits. (RT 3/1/05 132-133). While it was not covered in trial, an extended period of eligibility is thirty-six months in length. 42 U.S.C. § 423(e)(1). In this extended period of eligibility, a beneficiary's right to benefits is determined by assessing his ability to perform substantial gainful activity, not by the predetermined limit applying to the trial work period. In the first three months of extended eligibility, a beneficiary can still receive disability benefits even if they are performing substantial gainful activity. (RT 3/1/05 133). In the remaining thirty-three months of extended eligibility, a beneficiary can receive disability benefits in any month of that period when he does not perform substantial gainful activity. (RT 3/1/05 132). Movant does not dispute the numbers to which Ms. Jackson testified nor does he dispute her explanation of benefits and eligibility.

After Ms. Jackson explained the SSA's disability program, the prosecutor asked her about the SSA's investigation of Movant. The SSA began investigating Movant, at least in part, because it received a report from Movant's former father-in-law that Movant was working in 1996. (RT 3/2/05 8-9). Ms. Jackson testified that based on the report taken by the SSA, Movant's father-in-law came into an SSA office to report that Movant was working and submitted documents suggesting that Movant may have returned to work in 1993. (RT 3/2/05 12). A representative with the SSA contacted Movant and on May 11, 1996 Movant told the representative that he had been attending insurance school in the last year and had started self-employment in the previous month. (RT 3/2/05 12-14). At the time, the representative determined that Movant was not engaging in substantial gainful activity. (RT 3/2/05 17). Ms. Jackson testified that there was no report of Mr. Bond reporting work activity to the SSA between May 1996 and July 1997. (RT 3/2/05 18). She further testified that the only reported contacts between SSA and Movant were the contacts initiated by the

SSA. (3/2/05 120-121). The SSA received another report that Movant was working in July 1997. (RT 3/2/05 18, 20).

After the SSA received the work report in 1997, it referred it to one of its claims authorizers to investigate the work activity. (RT 3/2/05 21, 24-25). In May 1998, an SSA representative conducted a continuing disability interview with Movant. (RT 3/2/05 27). Movant informed the representative that he could work two hours a week and have one appointment per week. (RT 3/2/05 27-28). In response to inquiries about his work activity in June 1998, Movant informed SSA that he had begun working for his own company, Paradise Alliance, for one day a week. (RT 3/2/05 35, 38, 40). He indicated that he earned a net profit of $150 per month the first six months of 1998 and worked less than 40 hours per month. (RT 3/2/05 27-29, 37-39). Movant also volunteered that he could only make one insurance call a week because of "severe debilitating" headaches. (RT 3/2/05 32-33, 40). The SSA again determined that based on the information it would continue disability benefits. (RT 3/2/05 44-46).

A few years later in 2001, the SSA inquired about Movant's self-employment earnings from 1996 to 1999. (RT 3/2/05 48, 51-54). Movant provided information that he earned the following net income in 1998: January $600, February $600, March $650, April $600, May $600, June $650, July through November $650 per month, December $2800. (RT 3/2/05 44, 50-51). Movant also showed that in 1999 he earned net income of: January $650, February $550, March $450, April $460, May $550, June $450, July $450, August $500, September $650, October $450, November $600 and $2000 in December. (RT 3/2/05 49-50). After this report, the SSA determined Movant was not entitled to disability benefits for the months that he had substantial gainful activity. The evidence submitted by Movant to the sentencing judge of his net income as reported to the SSA from the IRS was substantially higher. Movant's net income in 1998 was $9,734.00 or $811.17 per month; in 1999 it was $7,874.00 or $656.17 per month; and in 2000 it was $1,480.00 or $123.33 per month. (Doc 168, Attachment E).

At trial the prosecution also called the special agent from the SSA's OIG assigned to

the investigation of Movant. The agent testified primarily about the documents discovered in a search of Movant's home. (RT 3/2/05 156-158). The agent's testimony highlighted his inexperience and the mistakes he made in investigating Movant. The agent began working with OIG in June 2001. Four months later he was assigned the investigation of Movant in October 2001. (RT 3/8/05 33). On cross-examination, the agent admitted that most of the four months prior to this investigation he was in training. (RT 3/8/05 33-34).

Crucial to Movant's case was an assessment of his net income as the SSA based his eligibility on net income and hours worked. The OIG agent admitted that he knew the IRS provided the SSA with beneficiaries' net income as reported to the IRS and that the information would be available on the SSA's "mainframe" computer. Yet, the agent testified that he did not put a copy of that information in Movant's file nor consider the information himself. (RT 3/8/05 38). When asked whether he knew that the SSA assesses a self-employed person based on net income, the agent testified that he "was still learning the Social Security programs". (RT 3/8/05 40). He further testified that at the beginning of this investigation that he was looking at gross income, not net income. (RT 3/8/05 33-34, 40-41). Counsel for Movant also questioned the agent about his testimony before a grand jury and the agent admitted that parts of his testimony were incorrect. (RT 3/8/05 106, 111, 113).

In describing the execution of the search warrant on Movant's home, the agent explained that Movant's house had a separate business entrance and that inside that entrance Movant maintained an insurance office. (RT 3/2/05 159-160). The business entrance was marked with a sign reading "insurance office". (RT 3/2/05 159). The agent discovered a number of documents related to Movant's business(es) in the office. (RT 3/2/05 174-175).

The search revealed statements showing Movant received substantial commission payments from insurance companies. (RT 3/2/05 174-175). In the search of Movant's home, the agent also found tax returns from 1997, 1998, and 1999. These returns showed Movant earned significant gross income with his insurance business and incurred substantial driving mileage for his business. (RT 3/8/05 24-26). The agent testified in detail about the amount of commission earnings he found for Movant and the amount of gross income listed on the

three tax returns. For instance, the 1997 tax return showed that Movant's insurance business, Paradise Insurance Alliance, had gross sales of $15,620 and that Movant drove 16,033 miles for business. (RT 3/8/05 27-28). The 1998 return showed that the business had $32,878 in gross sales and that Movant drove 25,650 miles for business. (RT 3/8/05 29-30). The 1999 return showed that a business called "MSA Experts/Paradise Insurance" had gross sales of $33,546 and that Movant drove 25,050 miles for business. (RT 3/8/05 31-32).

The agent also testified to other circumstantial evidence discovered in Movant's home. For instance, the search revealed an advertisement to sell a shaving products business owned by Movant. (RT 3/2/05 162). The advertisement listed annual sales of $18,000 for 1998, $15,850 for 1997, $5,210 for 1996 and an asking price for the business of $12,000. (RT 3/2/05 162). On cross-examination and in Movant's testimony, the evidence showed Movant had significant inventory for the business that was old and Movant testified that the business lost money. (RT 3/8/05 52-59, 63). The agent also described a demand letter discovered in the search of Movant's home. (RT 3/8/05 19). In the letter, Movant demands payment for marketing services he provided to a private investigator. (RT 3/8/05 19-20, 141). In the letter, Movant stated he worked from September 8, 1994 through October 27, 1994 for an average of 52 hours per week. (RT 3/8/05 20).

From the cross examination, it was clear that the agent did not consider Movant's business expenses and did not attempt to determine net income for any of the months in question. When asked on cross-examination whether the agent considered any of Movant's expenses to determine net income, he answered that he did not. (RT 3/8/05 103). Movant's counsel pointed out the evidence of expenses found in Movant's business files when the OIG searched Movant's house. (RT 3/8/05 100-104). Movant's counsel asked the agent if he considered that evidence in determining Movant's income. The agent testified that he did not consider that evidence in evaluating Movant's income nor did the agent compare those expenses to Movant's tax returns. (RT 3/8/05 103).

The prosecution's third witness, a certified public accountant ("CPA") for the SSA-OIG, testified to his summaries of the documents discovered in the search of Movant's home.

(RT 3/2/05 156-157). The CPA created an eight page spreadsheet itemizing Movant's insurance commissions based on the documents discovered in Movant's home office and from subpoenaed information on commissions from the insurance companies. (3/8/05 158-160). He testified that based on information obtained in the search of Movant's home, Movant earned $14,700.87 from insurance commissions in 1996, $16,431.77 in 1997, $31,843.57 in 1998, $38,416.92 in 1999, $34,214.27 in 2000, $38,996.63 for 2001, and $2,698.78 for January 2002. (RT 3/8/05 164-169). In each of those years the Government's CPA provided a monthly average of the insurance commission income.

The CPA also testified about Movant's earnings based on documents the prosecution subpoenaed from the insurance companies. (RT 3/9/05 11). Based on the subpoenaed information, Movant had gross income of: $14,295.95 in 1996; $16,255.96 in 1997; $30,388.71 in 1998; $43,257.71 in 1999; $38,110.25 in 2000;$41,473.04 in 2001; $35,433.84 in 2002. (RT 3/9/05 15-16). The CPA provided a monthly average for this gross income as well.

Based on the subpoenaed earnings statements, the CPA testified that Movant's income from 1996 to 2002 was $ 219,215.45. (RT 3/9/05). The CPA further explained on cross-examination that the records of commission statements seized from Movant's home only contained a total of $177,653.77 because those statements only included data through January 2002 and did not include subsequent months in 2002 after the search warrant was executed. (RT 3/9/05 13). The CPA also noted that some of the subpoenaed data seemed to be missing a month or two from one or two insurance companies. (RT 3/9/05 13-14).

The prosecution presented three years of Movant's expenses during the relevant six year time period. The CPA testified to Movant's business expenses in 1997, 1998, and 1999. (RT 3/9/05 8-9). In 1997, Movant had the following expenses: Advertising $2,246; Car and truck expenses $1,456; Depreciation $3,601; Other $58; Office expenses $1,216; Supplies $1,139; Taxes and licenses $475; Taxable meals and entertainment $196; other expenses including long distance calls $1,125. (RT 3/9/05 8-9). In addition to his expenses, Movant reported to the IRS that he drove 16,033 business miles in 1997 or about 1,300 business

1  miles a month in that year.  (RT 3/9/05 9).  The tax return also showed a net profit of $1,740.

2  (RT 3/8/05 170; RT 3/9/05 9).

3  Based on Movant's 1998 tax return, the Government's CPA showed Movant reported

4  a net profit of $10,540.  (RT 3/9/05 10).  Movant's claimed 1998 business expenses included:

5  Advertising $1032; Car and truck expenses $8,336; Commissions and fees $129;

6  Depreciation $3,013; Legal and professional services $60; Office expenses $1,229; Vehicles,

7  machines and equipment $526; Supplies $1,633; Travel $984; Taxable meals and

8  entertainment $223; Other expenses $1,147 including long distance calls.  (RT 3/8/05 173).

9  The reported business miles was 25,650, an average of approximately 2,000 miles per month.

10 (RT 3/8/05 173).  The CPA testified that in both the 1997 and 1998 tax returns, Movant did

11 not include social security benefits as income.  (RT 3/8/05 147-148).

12 Movant's 1999 tax return showed a net profit of $8,526.  (RT 3/9/05 10).  The CPA

13 read a list of Movant's expenses in the 1999 tax return, which included: Advertising $1,584;

14 Car and truck expenses $8,141; Commissions and fees $161; Depreciation $3,003; Office

15 expenses $1,763; Vehicles, machines and equipment $121; Supplies $1,697; Travel $4,747;

16 Taxable meals and entertainment $308; Other expenses $1,939 (mostly long distance calls).

17 (RT 3/8/05 171).  In 1999, Movant claimed 25,050 of business miles, an average of

18 approximately 2,783 miles per month.  (RT 3/8/05 172).

19 On cross-examination the CPA admitted that, even though the SSA evaluates a self-

20 employed beneficiary's eligibility based on net profit, his analyses only included gross

21 income.  (RT 3/9/05 28).   He also admitted that his analyses did not include any business

22 receipts or expenses.  (RT 3/9/05 28).  Furthermore, the CPA admitted that he did not

23 distinguish between new insurance commissions and commissions based on renewals of

24 policies.  (RT 3/9/05 29-31).

25 In his habeas petition, Movant argues, in part, that his trial counsel committed

26 prejudicial error by not obtaining a defense economic expert to explain residual income.  At

27 trial, Movant argued that much of his income included residual commissions from insurance

28 sales he made in prior years and therefore, because these sales were a one-time work event

in prior years, they should not be included as part of his net income in the year received.

As part of his residual income argument, Movant offered, through the testimony of a character witness, a description of health savings accounts ("HSAs"), the main product Movant sold. (RT 3/10/05 210). Movant's character witness, also an insurance salesperson, explained that an initial sale of an HSA usually earns the agent 20% and then the agent earns 5% on any renewals of HSAs and significantly, that no new work is done for those renewal HSAs. (RT 3/10/05 212-214).

On direct examination, the Government's social security expert, Ms. Jackson, testified that residual income sold from different types of insurance policies would count toward substantial gainful activity analysis. (RT 3/2/05 72). On cross-examination, defense counsel questioned Ms. Jackson about residual income. (RT 3/2/05 142-146). Ms. Jackson explained that residual income from the sale of insurance policies is included in an analysis of beneficiary's eligibility because renewal requires some work. (RT 3/2/05 143-145). In contrast, Ms. Jackson explained that residual income from writing a song, for instance, would be a one-time work event requiring no new work to continue receiving residual income. (RT 3/2/05 143). When Movant's trial counsel explained that HSAs renew without any contact between the insurance agent and the client, Ms. Jackson said it sounded like that would be a one-time work event. (RT 3/2/05 146).

Movant's trial counsel also questioned the CPA about residual income. The CPA acknowledged that some of the commission statements found in Movant's home and subpoenaed from the insurance companies distinguished between a first-year commission and a residual commission but some did not and other statements it was difficult to discern, so he decided not to distinguish between the commissions. (RT 3/9/05 30). For his part, Movant testified that multiple SSA employees told him that residual income was not included in determining his eligibility for benefits. (RT 3/10/05 46). Movant testified at trial that he did not know at that point whether residual income did or did not count for purposes of determining his eligibility. (RT 3/10/05 191).

As part of his defense, Movant took the stand and testified about his insurance

business and the other evidence discovered at his home office. Movant denied and also offered explanations for the circumstantial evidence found in his home. Movant claimed that he did not know anything about the advertisement found at his house offering to sell his shaving products' business. (RT 3/9/05 103-109). In fact, Movant denied preparing the advertisement or providing the business information to someone else to prepare the advertisement. Movant also explained that he lost money in the business and that he still had unopened product in his shed from 1993. (RT 3/9/05 90-94). He also said that his friend "Carmel" did most of the work for the business; although, he admitted that the checks from the business went to his account. (RT 3/9/05 99; 3/10/05 129).

Movant also tried to explain the demand letter the agent found at his home in which Movant demanded payment from a private investigator for marketing work completed by Movant in 1994. (RT 3/9/05 28). Movant explained that the private investigator hired him to produce a newsletter and agreed to pay Movant $250 a week for seven weeks of work but Movant claimed he did not do work on the newsletter but demanded the investigator pay him anyway. (RT 3/9/05 31-32). Movant testified that the private investigator told him that Movant could count hours that he was "thinking about [the newsletter] in [his] sleep" and that the private investigator wanted to help him out. (RT 3/10/05 31). Movant also denied filing a lawsuit to recover payment for that work but admitted that a friend filed the lawsuit on his behalf to recover the payment. (RT 3/9/05 32-33).

Movant also testified specifically to his insurance business and the amount of work he was able to do in it. Movant testified that his disability limited him to having only one client a week from 1995 to 2001. (RT 3/9/05 129-130). When asked by the prosecution whether he had "thousands" of clients by 2000, Movant stated he did not think so. (RT 3/10/05 145). After his response, the prosecution offered as an exhibit a letter from October 2000 in which Movant stated he was "currently blessed with MSA [medical savings account] clients now in the thousands." (RT 3/10/05 153). Specifically, the letter read:

Nancy, I am currently blessed with MSA clients now in the thousands. Several companies have informed me that I have written more MSAs than any other agent in the United States. I have determined this blessing is a result of my web sites since 1997, referrals from individuals and companies, newspaper

> articles I've written, newsletters, government involvement, member/officer to the Alternative Benefits Association of Agents and Brokers, being a co-founder of the 501C-3 nonprofit organization called the Optimal Health Foundation, and probably mostly because of my understanding of the law."

(RT 3/10/05 153, *see also* Trial Exhibit 96). When the prosecution presented the letter, Movant responded that he did not write the letter and "kind of" read it before he signed it. (RT 3/10/05 153). When asked whether the statement was false, Movant said "[w]ell, I'm blessed with MSA client *potential* in – the thousands." (RT 3/10/05 153) (emphasis added). Movant also explained that he wrote more MSAs than other agents "in the very beginning" and that the reference to articles he had written was to one article that was about three paragraphs long. (RT 3/10/05 155). Movant also claimed that even though he was a co-founder of the nonprofit founded in 1997, the nonprofit only had four meetings and then he was asked to step down and the nonprofit dissolved. (RT 3/10/05 158).

The prosecution also offered evidence of a bankruptcy court document from Movant's bankruptcy case in October 2000. In the schedule, Movant declared a net monthly take-home pay of $5000. (RT 3/10/05 135). Movant stated that was not a correct figure of his income and that his attorney completed the paperwork. (RT 3/10/05 135-136).

Movant also claimed his net profits from the business were decreased by his substantial expenses, including a remodel his house to accommodate his business. (RT 3/9/05 127-129). Movant testified generally to the start-up expenses of operating a business, including substantial advertising expenses. (RT 3/9/05 126-128).

Many facts arose in trial from which the jury could determine Movant's credibility. Movant testified that he mailed a letter to the SSA inquiring about income reporting on May 1, 1996, a few days before the SSA contacted him about his working. (3/10/05 161). Ms. Jackson testified this letter was not in Movant's SSA file. (3/2/05 121). The OIG agent testified that he did find a copy of this letter in Movant's home with the date of May 1, 1996 and that Movant's SSA file showed that the SSA contacted Movant on May 11, 1996 about a report of his working. (3/8/05 151). On cross-examination, Movant admitted that when the SSA contacted him on May 11, 1996, he did not mention that he had just written a letter to the SSA. (3/10/05 161). Also, because Movant put his credibility at issue, the prosecution

was permitted to introduce evidence of Movant's character for truthfulness. The prosecution showed that in 2001 Movant was found guilty of impersonating a federal officer. (RT 3/10/05 90).

After Movant testified, he presented two character witnesses, one of which offered the testimony about how HSAs work. Counsel then made closing arguments and the jury was sent to deliberate. The jury deliberated for an hour and fifteen minutes and then returned a verdict of guilty on both counts. (RT 3/11/05 123).

Prior to sentencing, the case was transferred to a new district judge and unrelated to the transfer, the defense attorney filed multiple extensions for additional time to file objections to the presentence report and an untimely motion to reconsider the denial of motion for new trial. (Sentencing RT 1/9/2006 3-4). Judge Campbell, treating the motion for reconsideration as a motion for a new trial based on newly discovered evidence, denied the motion for reconsideration on the merits. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183). He determined the financial evidence presented by defense in the motion for reconsideration was available before trial and therefore, not newly discovered. Furthermore, the Court determined the evidence would not have affected the outcome of the trial.

***Sentencing***

Judge Campbell granted defense counsel's request for an accountant to help counsel prepare for sentencing. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 146). At sentencing, the district court determined the loss amount for purposes of sentencing was $88,800.70. This was an amount reduced from the original $101,222.70. The court explained the reduction in its written order denying the motion for reconsideration. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 9).

In objections to the presentence report, Movant argued that he was determined ineligible for benefits based on gross income and therefore, the Government never proved in what months of the given six year time frame Movant made more net income than permitted. If net income was considered, Movant maintained that he did not receive enough income between August 1996 through July 2002 to be ineligible for benefits. The sentencing

judge considered the evidence offered by the Government at trial of the insurance commissions Movant received from 1996 through 2002. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 10-11). That evidence showed Movant received $219,215.45 of gross income during the period in question. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 11). The sentencing judge also noted Movant's counsel did not provide the jury with a breakdown of net income versus gross income and no monthly breakdown of the numbers. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 12).

The sentencing court found the Government proved the elements of the two crimes charged but that it did not prove that Movant was ineligible for benefits prior to August 1996. The sentencing judge noted the Government never showed Movant's nine month trial work period expired prior to August 1996. Therefore, the Court subtracted nine months from the loss amount and determined that Movant owed $88,800.70. (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 12). Because the amount was above $70,000, Movant was subject to an eight-level enhancement and the loss amount was used for purposes of assessing restitution against Movant (*See* U.S.A. v. Bond, cr-03-974-DGC, Doc 183, p 13).

***Evidentiary Hearing***

In the supplemental briefing, the Magistrate Judge ordered the parties to brief the issue of ineffective assistance of trial counsel. In the briefing, defense counsel generally argued that Movant's trial counsel was experiencing personal crisis while representing Movant and did not adequately prepare for trial. (Doc 159). Movant's counsel then argued two specific points of ineffective counsel. The primary preparation failure was the lack of an economic expert. Defense counsel argued that trial counsel failed to timely request a certified public accountant to explain the case to counsel and to explain the economics of the case from the Movant's perspective at trial. Movant contends his net income was below the amount considered substantial gainful activity. He argues that much of his income was commissions he earned from renewals on clients' insurance policies. He argues commissions on renewal policies required no work on his part and were therefore residual income, which should not have been included in income determining his benefit eligibility. He, therefore, argues his

counsel was ineffective because he failed to present this complicated financial argument through an expert in a detailed way that the jury could understand. Second, he argued trial counsel was ineffective in failing to request a jury instruction or motion for election to advise the jury that it must unanimously determine Movant's guilt based either on the amount of money he made or the number of hours he worked.

In its supplemental briefing, the Government responded by arguing Movant's two claims of ineffective assistance of counsel are meritless as a matter of law and that the Court should vacate the evidentiary hearing. (Doc 167). Specifically, the Government contends that the SSA includes income from renewals of insurance policies when that income is received for purposes of determining benefits eligibility. Second, the Government argues that only each element of a crime must decided unanimously and that a jury does not have to be unanimous in its theory of liability.

Both sides also submitted additional responsive briefing after the supplemental memoranda were filed. (Docs 168, 169, 170, 171).

At the evidentiary hearing, Movant presented three witnesses including CPA Gary Gard, who was involved in analyzing Movant's income in the sentencing phase of his prosecution; Timothy Holtzen, Esq., Movant's trial counsel; and Movant also testified.

Mr. Gard testified that he has been a licensed CPA since December 1979. His experience includes eleven years with the Internal Revenue Service working on tax cases and thirteen years with the United States Attorney's Office working on white collar crime investigations. (Doc 181, Transcript from Day 1 of Evidentiary Hearing 12/1/09 11). He does not have experience or background in working with the SSA and the way the SSA accounts for residual income. (TR 12/1/09 13-14).

Mr. Gard was hired by the defense prior to Movant's sentencing. (*See* Doc 183, cr-03-974-DGC). When initially hired by defense counsel, Mr. Gard went to the SSA to meet with employees and determine how the SSA categorizes insurance commissions on renewals of health insurance policies. Mr. Gard testified at the evidentiary hearing that the SSA employees were not able to give him a clear answer. (TR 12/1/09 14-15). After the person

at the front desk did not know the answers to Mr. Gard's questions, he was referred to Anna VanHerck, a supervisor, who told him that whether residuals count in net income depends on facts and circumstances of each case. (TR 12/1/09 16). Also, to his knowledge, Mr. Gard was the only person working for Movant's defense who had been to the SSA to discuss issues relevant to Movant's case. (TR 12/1/09 44).

In addition to investigating the issue of residual income, Mr. Gard was the first person in Movant's case to present Movant's net income, as reported to the IRS. Mr. Gard presented a chart of Movant's net income with and without residual income for each of the years in question. At sentencing, this chart was offered to show Movant did not earn above the allowable amount to become ineligible for benefits. At the evidentiary hearing, Movant's counsel offered this chart as an exhibit and Mr. Gard testified as to its meaning.

According to Mr. Gard, in the years of 1993, 1994, and 1995, the IRS reported to the SSA that Bond's income "net earnings" was zero. (TR 12/1/09 23; *see also* Doc 168, Attachment E; Exhibit 7). This is because when Movant filed his tax returns, his self-employment net income was lower than the threshhold amount that is reported from the IRS to the SSA. (TR 12/1/09 22-23). For self-employment, Mr. Gard identified that threshhold as $400 or $500. (TR 12/1/09 23). When asked if the IRS reporting "net earnings" to the SSA as zero meant that Movant was reporting less than $400 in self-employment net income, Mr. Gard answered, "yes". (TR 12/1/09 23-24). Mr. Gard also explained that he talked with the IRS to make sure that the net income numbers he used from the IRS documents were the same numbers that the SSA was receiving from the IRS. He was informed that they were the same numbers and that the IRS was not auditing Movant or finding that any of his reported numbers were incorrect. (TR 12/1/09 33-35).

In 1996, the IRS reported to the SSA that Movant earned $1584 net income. (TR 12/1/09 25-26). Mr. Gard averaged this number and determined Movant earned approximately $132.00 per month in 1996. (TR 12/1/09 26). Mr. Gard testified that he did not have any records that would permit him to determine exactly how much of the annual net income was earned in any given month. (TR 12/1/09 26). Although the Government did not

stipulate to Mr. Gard's assessment of trial work period, Mr. Gard's chart shows that based on Movant's net income as reported to the IRS, Movant did not use any of his trial work period in 1993, 1994, 1995, or 1996. (Doc 168, Attachment E, p 20).

In 1997, the IRS informed the SSA that Movant reported $1607 in net income. (TR 12/1/09 28). Additionally, Mr. Gard's chart identified residual income that Movant received in 1997 from insurance policies he sold in 1995 and 1996. (Doc 168, Attachment E, p 21). The residual income totals $2,960.00. (Doc 168, Attachment E, p 21). Because it is Movant's position that residual income does not count in analyzing a beneficiary's eligibility for benefits, Mr. Gard subtracted the $2,960.00 from Movant's net income of $1,607.00 to determine that Movant made zero net income in 1997. (TR 12/1/09 28-29). When questioned by the Court, Mr. Gard explained that the residual income of $2,960.00 would have been included in Movant's gross income for 1997 for tax purposes because the IRS considers residual income earned when received. (TR 12/1/09 29).

In 1998 and 1999, Movant's net income is above the permitted limit unless residual income is not included in the calculation. In 1998, Movant's net income was $9,734.00 or $811.17 per month. (Doc 168, Attachment E, p 22). Mr. Gard identified $12,459.00 in residual income for 1998 and therefore, Movant argued that his net income for 1998 would be zero. (TR 12/1/09 36). If residual income was included in net income, according to Mr. Gard's chart, 1998 would be Movant's first year that he was earning more than the allowable amount. In 1999, the IRS reported to the SSA that Movant earned $7,847.00 in net income or $656.17 per month. (Doc 168, Attachment E, p 24). Again, Mr. Gard testified that he identified $12,966.16 in residual income for 1999 and therefore, if residual income is not included in determining Movant's eligibility for benefits, his net income would be zero. (TR 12/1/09 37-38).

Movant had not filed his taxes for tax years 2000 and 2001 when Mr. Gard was hired to analyze his income. Thus, Mr. Gard referred Movant to a tax accountant who was an enrolled agent with the IRS to prepare his returns so that Mr. Gard could include Movant's net income in his chart for those years. (TR 12/1/09 38). Based on his tax returns, Movant

earned a net income of $1,480.00 in 2000 or $123.33 per month and a negative net income of -$435.00 in 2001. (Doc 168, Attachment E, pp 25-26). Subtracting residuals from the net income, in 2000, Movant would have earned zero because he earned $5,147.00 in residuals. Likewise, his income in 2001 would be reported as zero, in part, because he earned $978.00 in residuals. (TR 12/1/09 39; Doc 168, Attachment E, pp 25-26).

In 2002, Movant had filed a tax return and Mr. Gard was able to determine Movant earned a net income of $20.969.00 or $1,747.42 per month. (TR 12/1/09 40, Doc 168, Attachment E, p 27). Mr. Gard could not determine residuals for 2002 because he could not obtain the necessary documents. (TR 12/1/09 40).

At the evidentiary hearing, the Court inquired into Movant's theory of residual income. Critical to the Court was when, under Movant's theory, residual income would be applied to Movant's income for purposes of determining his eligibility for benefits. If the residual income is not applied when received, presumably, it must be applied when the policy originally issues or at some earlier date. (TR 12/1/09 41). The Court asked Mr. Gard in what year the residual income would count. For instance, the Magistrate Judge pointed out that the $12,996.16 of residual income earned by Movant in 1999 would have to be accounted for in some year prior if it does not count when it is paid. (TR 12/1/09 37, 40). Mr. Gard said he never applied the residual income to any year because the SSA never gave him any guidance on how to apply it - only that it depends on the facts and circumstances of each case. (TR 12/1/09 41-42). Mr. Gard subtracted the residual income from Movant's net income in the year it was received but that residual income was never included in any other year of Movant's net income.

After Mr. Gard testified, Movant called his trial attorney, Mr. Holtzen. It is clear from the testimony presented by defense at the evidentiary hearing that Movant's trial counsel was in personal crisis and not at his best while he defended Movant. Timothy Holtzen, Movant's trial counsel, has an extensive background in criminal law. (TR 12/1/09 60-61). He worked as a prosecutor with Pinal County and Yuma County, rising to chief criminal deputy in Yuma. (TR 12/1/09 61). He worked with the Arizona Attorney General's Office and the

United States Attorney's Office for seventeen years before entering into private defense practice toward the end of 2003. (TR 12/1/09 61). Mr. Holtzen was accepted to the felony panel of the Criminal Justice Act attorneys in Phoenix in May 2004. (TR 12/1/09 61). While he had significant experience as a criminal trial prosecutor, this was his first time litigating felonies as a criminal defense attorney. (TR 12/1/09 61-62). Mr. Holtzen had little to no experience defending a social security fraud case. (TR 12/1/09 62). His most recent background was in immigration cases. (TR 12/1/09 62). The document review in this case was intensive. Mr. Holtzen testified that agents in the search of Movant's home had retained "hundreds or thousands of pages." (TR 12/1/09 66).

Mr. Holtzen spoke candidly at the evidentiary hearing regarding the issues in his life during his representation of Movant. Mr. Holtzen explain that just before he was appointed to represent Movant that Mr. Holtzen's nephew died of a drug overdose; that while he was representing Movant, both of his aging parents who lived out of town required help in making new living arrangements, that as he was moving his father out of a hospital in Payson, his mother-in-law was in a collision that eventually led to her death seven months later, that he moved in with his father to take care of him and that his wife filed for divorce in September of the same year. (TR 12/1/09 70-71).

Mr. Holtzen also testified that he wished he had more time to prepare for trial but that he felt "that in every one of a couple hundred trials I've done, I haven't had enough time." (TR 12/1/09 72). He also testified that he did work through the night on occasions and stayed up for sometimes 48 hours to prepare, but that he always wished he had more time to prepare for his cases. (TR 12/1/09 72,100). He also stated that occasionally working through the night does not effect his performance. (TR 12/1/09 101).

Evidence was presented of trial counsel's lack of preparation. At the evidentiary hearing, Movant's counsel asked Mr. Holzen if he remembered that at the beginning of Movant's trial Mr. Holtzen told the trial judge that he had only been through three fourths of the materials at the OIG. (TR 12/1/09 103-104). Mr. Holzen explained in the evidentiary hearing that he had been through all the boxes of documents but there may have been

videotapes or other evidence that he believed was not relevant to the case that he did not review prior to trial. (TR 12/1/09 107-108; *see also* RT 3/1/05, p 20, ll. 8-13). From the trial transcripts, it was also evident that Mr. Holtzen was not prepared with the witness list and exhibit list at the start of trial. (TR 12/1/09 130). When asked about this lack of preparation, Mr. Holzten began by explaining that Movant had, at one point, over 200 character witnesses he wanted to call and that it took Mr. Holzten some time to finalize that list with Movant. (TR 12/1/09 130-131). Regarding the exhibit list, Mr. Holzten testified that he had computer problems and difficulties opening attachments from his paralegal who was working on some of the exhibits. (TR 12/1/09 131-132).

In addition to trial counsel's lack of preparation, the defense presented evidence of trial counsel's failure to hire an economic expert for the case. At the evidentiary hearing, Movant's counsel inquired into why Mr. Holtzen did not obtain a CPA to help him analyze the case. On examination by Movant's counsel, Mr. Holtzen admitted that he made case notes to motion the court for a CPA in November 2004 but that he did not file such a motion until February 2005. (TR 12/1/09 80-81). At least by November 2004, Mr. Holzten had discussed with Movant that Movant believed residuals, repeated commissions for the sale of insurance policies, did not count as part of income determining eligibility for benefits. (TR 12/1/09 85). Mr. Holzten also testified that he discussed Movant's case with a CPA and that the CPA stated the case would come down to Movant's net income but that he did not know whether residual income would or would not count. (TR 12/1/09 96). It is not clear when this conversation with the CPA occurred. This was the CPA that Mr. Holtzen eventually requested to hire with funds from the Court. That motion was denied because it was untimely. Mr. Holzten did not interview anyone at the SSA. (TR 12/1/09 85). Prior to sentencing, trial counsel again requested funds for a CPA. The sentencing judge granted that request. At the evidentiary hearing, Movant testified that the CPA's work on Movant's case was helpful. (TR 12/1/09 101).

At the evidentiary hearing, Mr. Holtzen was asked about his strategy for Movant's case. Mr. Holtzen testified that he believed the prosecution could bring three possible

theories to prove Movant's guilt.  The government could argue (1) that Movant made too much money and did not report it or concealed it; (2) that he worked too many hours; or (3) that he was malingering and never actually disabled.  (TR 12/1/09 90).  Regarding the first theory, Mr. Holtzen testified that he considered early in the case whether the commissions Movant made from the sale of health insurance policies counted as income in determining his eligibility for disability benefits.  (TR 12/1/09 90-91).  Mr. Holtzen testified that he could not find a clear answer on whether these commissions should count.  (TR 12/1/09 91).  He stated that he researched, looked at the statutes, the regulations, and some of the treatises but could not find an answer on residual income.  (TR 12/1/09 91).  Mr. Holtzen did not interview anyone from the SSA and while he asked other attorneys, there is no evidence that he considered looking at other sources, such as an expert in social security to discover the answer.  (TR 12/1/09 91).  Mr. Holtzen testified that based on his own analysis and discussions with other lawyers, he believed this theory would boil down to Movant's net income and how his net income is determined.  (TR 12/1/09 91-92).  Mr. Holtzen did present the residual income argument to the jury through testimony and the closing argument.  (TR 12/1/09 94).

At the evidentiary hearing, Mr. Holtzen testified that he spent a significant amount of time trying to determine Movant's net income and that Movant was not helpful in the process.  (TR 12/1/09 92).  Movant told Mr. Holtzen that "he had to estimate it because he wouldn't know until the taxes were done next – in the next year what his net income was to be spread across the year."  (TR 12/1/09 92).  While Mr. Gard was able to find Movant's net income for the given years at the IRS office, there is no testimony that Mr. Holtzen attempted to gather that information from the IRS office.  Mr. Holtzen attempted to get Movant's tax files from Movant's accountant but Movant refused to sign the consent form for Mr. Holtzen to receive those files.  (TR 12/1/09 92-93).  Movant claimed he had some personal issue with his accountant and did not want him involved in the case.  (TR 12/1/09 94).  Movant explained at the evidentiary hearing that his accountant was a personal friend of his former fiancee and that his relationship with the fiancee and family had dissolved and was estranged

and he therefore did not want to interact with his former accountant. (Doc 182, Transcript of Evidentiary Hearing Day 2, 12/2/09 65).

At the evidentiary hearing, Movant's counsel asked Mr. Holtzen about why he did not make any financial charts. (TR 12/1/09 133). Mr. Holtzen testified that he chose not to make charts because:

> [he] was trying not to have the jury focus on the documents about income such as [Movant's] income tax returns in part because there were references in each of the years of the income taxes to 16 to 25 thousand miles being driven each year for business, which if I had been focusing on the income tax returns and had the jury staring at them and seeing that, it seemed to me it would be easy for them to conclude if he was driving thousands of miles a month, that was more than working – I mean more work than 40 hours.

(TR 12/1/09 148).

Movant's counsel also asked Mr. Holtzen why he did not make a chart as part of his cross-examination of the Government's CPA. (TR 12/1/09 134). Mr. Holtzen testified that he was focused on raising doubt about what the CPA had not considered like net income and residuals, to show the government did not satisfy its burden. (TR 12/1/09 134). When questioned by the Government, Mr. Holtzen testified that he believed it was a better strategy to raise general doubt as to the Government's proof on this issue of income rather than to establish as a defense what Movant's net income was on a month-by-month basis. (TR 12/1/09 146). With regard to the miles, Mr. Holtzen testified that Movant at one point told him the miles in one year may have been 2,500 rather than 25,000 and that the miles in one year may have been a business trip to Illinois. (TR 12/1/09 149-150).

Trial counsel had significant difficulties being timely in the sentencing phase of Movant's case. Three sentencing hearings were held before Movant was finally sentenced because trial counsel sought continuances and filed an untimely motion for reconsideration of the court's denial of a motion for new trial. (*See* Sentencing Transcripts 1/9/06, 1/17/06, 3/1/06). In the first sentencing hearing, held on January 9, 2006, the sentencing judge expressed frustration because after the granted continuances, trial counsel did not file objections until the Saturday before sentencing in January. (Sentencing Transcript, 1/9/06 4). The sentencing judge pointed out that trial counsel had already asked for a continuance

in October 2005 because he had just received the presentence report and another continuance in November 2005 to draft objections. (Sentencing Transcript, 1/9/06 3). The judge also noted in that first January sentencing hearing that trial counsel had also just filed a motion for reconsideration of the judge's July denial of a motion for a new trial. (Sentencing Transcript, 1/9/06 5). The sentencing judge told trial counsel that he would hold a hearing to determine whether to sanction trial counsel for the late filing of objections to the presentence report as well as the untimely motion for reconsideration. (Sentencing Transcript, 1/9/06 9).

On the second day of the evidentiary hearing, the Government called Jennifer Plewa, a Operations Supervisor for SSA with significant background in Title II social security disability. (Doc 182, Transcript of Evidentiary Hearing Day 2, 12/2/09 3). The Government offered Ms. Plewa's testimony, in part, to explain the SSA's position on whether residual income is included in the net income to determine a beneficiary's eligibility. Ms. Plewa testified that she would count the residual income when it was received. (TR 12/2/09 27). Ms. Plewa explained she based her opinion on her general experience and the regulations she was taught to follow.

Ms. Plewa testified that the SSA relies on its Policy Operating Manual ("POMS") to apply social security policies to individual situations. (TR 12/2/09 4). Ms. Plewa testified that there are several POMS references directly related to life insurance and casualty insurance sales and how the income from those sales should be applied to an analysis of a person's social security benefit. (TR 12/2/09 5-6). She did, however, admit that the references are focused on old age retirement insurance and not disability insurance and therefore, not directly on point. (TR 12/2/09 6). When asked, she also testified that there is no social security rule that permits "retirement survivors" regulations to apply to disability insurance questions. (TR 12/2/09 19).

Under the POMS cited by Ms. Plewa, commissions for self-employment including the sale of medical insurance are applicable to benefits analysis when they are paid. (TR 12/2/09 6). The Government showed POMS R.S. 02505.170 "How to Treat Repeat Commissions on

Casualty Insurance" as proof that the SSA counts repeat commissions on health insurance when those commissions are earned. (TR 12/2/09 6-7). On cross-examination, Ms. Plewa admitted that this regulation is not directly applicable to beneficiaries of disability insurance. She explained that the "R.S." in the title of that particular POMS stood for "retirement survivors" and that there are regulations labeled "D.I.", which stand for "disability insurance". (TR 12/2/09 16). Therefore, the regulation the Government cited is not exactly on point as it does not explicitly apply to disability insurance. (TR 12/2/09 16). There is no regulation on disability insurance related to commissions or royalties. (TR 12/2/09 16).

While there is no rule guiding the SSA employees to apply "retirement survivors" regulations to questions about disability insurance, Ms. Plewa testified that based on her training and experience, she applied retirement survivors regulations to disability insurance questions in the absence of a disability insurance regulation. (TR 12/2/09 19). The Court noted that the POMS rule cited by the Government was very specific to retirement survivors benefits as it stated "consider S&I exclusion", which Ms. Plewa said related specifically to old age benefits only. (TR 12/2/09 36-37).

Ms. Plewa was asked about her understanding of the SSA employee's testimony at Movant's trial. Specifically, at trial Ms. Jackson testified that a person who writes a song does not include residual income earned from that song when it is played in later years because it was a one-time work event to write the song. (TR 12/2/09 21). In contrast, Ms. Jackson explained that commissions from renewals of insurance policies require some new work on the part of the insurance agent and therefore the residual income should be included in net income when it is received. (TR 12/2/09 21). Movant's counsel asked Ms. Plewa if she agreed with the distinction made by Ms. Jackson; she said she did not. (TR 12/2/09 22). Ms. Plewa testified that if Movant's case had come across her desk to determine disability eligibility, she would not have considered whether commissions from renewals of HSAs counted as residual income. (TR 12/2/09 27). She would have, instead, looked at Movant's income (including commissions from renewals of HSAs) to determine whether he was performing substantial gainful activity. (TR 12/2/09 27).

Ms. Plewa was also asked general questions about the eligibility for benefits and the loss of eligibility. On cross-examination, she testified that the trial work period is nine months, with three months of, essentially, a grace period when a person is still eligible for benefits even if they are earning substantial gainful activity. (TR 12/2/09 25-26). As described by Ms. Plewa, after a beneficiary's trial work period and the grace period expire (one year in total), the beneficiary enters an extended period of eligibility. (TR 12/2/09 26). In the extended period of eligibility, a beneficiary is not entitled to benefits in any month that they earn more than substantial gainful activity, but any month that they earn less, they are entitled to the benefit. (TR 12/2/09 26). As discussed supra. and outlined in statute, the three month grace period is actually the first three months of the thirty-six month extended period of eligibility. 42 U.S.C. § 423(e)(1).

Movant testified at his evidentiary hearing. He explained that he sold medical savings accounts (later called health savings accounts) under the Health Insurance Portability and Accountability Act (HIPPA) and that those accounts were one-time work events. (TR 12/2/09 44). Movant contends that SSA employees told him that residual income, like the commissions he earned from renewals of insurance policies, do not count in income assessment and do not affect his eligibility. (TR 12/2/09 53-54). Movant testified that he gave his trial counsel this information and asked him to use it at trial. (TR 12/2/09 53).

Movant also testified about his desire for his trial counsel to use charts to explain the net income argument at his trial. Movant stated that he wanted his trial counsel to have an expert create a chart on gross income and net income excluding residuals to show to the jury. (TR 12/2/09 55-56). After the trial court denied funds for a CPA to create a chart, Movant testified that his trial attorney told him that he would make a chart for the jury to see if he thought it was necessary during trial. (TR 12/2/09 61). Movant testified that he made a chart that he wanted trial counsel to use. As described by Movant, the chart he made totaled 348 pages and "would cover a wall 8 feet high by about 24 feet long..." (TR 12/2/09 62). The chart would show chronologically, by month, Movant's gross income, net income, and commissions. (TR 12/2/09 62-63).

Movant also testified that his trial attorney's personal life negatively impacted his attorney's ability to represent him. (TR 12/2/09 66-67). Movant stated that he repeatedly had difficulty getting his attorney to communicate with him. (TR 12/2/09 66).

**Discussion**

A federal prisoner may seek relief under 28 U.S.C. § 2255 if (1) his sentence was imposed in violation of the United States Constitution or the laws of the United States; (2) the sentencing court had no jurisdiction to impose the sentence on the prisoner; (3) the sentence imposed exceeded the maximum sentence authorized, or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is subject to collateral attack when it contains "a fundamental defect which inherently results in a complete miscarriage of justice" or "it presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Davis v. United States*, 417 U.S. 333, 346 (1974) (quotation marks and citations omitted).

This Court granted an evidentiary hearing on Movant's claims of ineffective assistance of trial counsel. A defendant's Sixth Amendment right to counsel means effective counsel. The United States Supreme Court defined the standard for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court determined that the right to counsel was critical to the right to a fair trial because the evidence must be tested in an adversarial system. 466 U.S. at 685. The Court stated:

> [t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

*Id.* (quotation marks and citations omitted). It is not sufficient for an attorney to be "present at trial alongside the accused", rather "[t]he Sixth Amendment recognizes the right to assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id.* Courts must consider as the benchmark for judging a claim of ineffectiveness "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Under *Strickland*, a movant must show both cause and prejudice to prevail on an ineffective assistance of counsel claim. *Id*. To show cause, movant must demonstrate that trial counsel's performance was objectively unreasonable, *i.e.*, "outside the wide range of professionally competent assistance." *Id*. at 688, 690. Judicial scrutiny of counsel's performance "must be highly deferential." *Id*. at 689. Counsel is "strongly presumed to have rendered adequate assistance." *Id*. at 690. Courts reviewing counsel's performance "evaluate the conduct from counsel's perspective at the time" to "eliminate the distorting effects of hindsight." *Id*. at 689. Strategic choices made by counsel after thorough investigation are "virtually unchallengeable." *Id*. at 690. A decision not to investigate must be assessed for reasonableness, applying a heavy measure of deference to counsel's judgments. *Id*. at 691. To show prejudice, movant must demonstrate there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Because a movant must prove both prongs of *Strickland*, a court need not decide one prong if movant fails on the other prong. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. at 697. "An error of counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691 (internal citation omitted). "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id*. at 692.

### Cause

In the case before this Court, Movant presents significant evidence that trial counsel's

performance was outside the wide range of professionally competent assistance. Counsel had numerous personal life crises that he was addressing during the time he was litigating Movant's case. Counsel lost a family member to a drug overdose, had to take care of ailing parents, which required living with his father for a time period, his mother-in-law suffered injuries in a collision that eventually led to her death and his wife filed for divorce all during the time that he was representing Movant. The Court appreciates trial counsel's candid testimony regarding the difficulties in his life while representing Movant. These crises were the backdrop for trial counsel litigating his first felony case as a defense attorney and his first social security fraud case.

The stress of trial counsel's personal life and his lack of experience as a defense attorney is evident through the docket and trial transcripts. At the evidentiary hearing, trial counsel testified that early in the case he understood the critical element of the case was whether Movant earned a net income above the allowable limit. Even though trial counsel allegedly understood net income was the critical element early in the case and that it should be assessed on a monthly basis for the time period in question, trial counsel did little work to determine Movant's monthly net income for the time period in question.

Trial counsel's failures to obtain information on Movant's net income were significant. Trial counsel did not obtain any records from the IRS or other source to determine Movant's net income. Trial counsel did ask Movant for permission to obtain tax records for a couple of years from Movant's accountant; Movant did not give permission. In its investigation, the OIG obtained copies of Movant's 1997, 1998, and 1999 tax returns. The Government used these tax returns as evidence but Movant's counsel did not address them. Trial counsel testified that he was concerned focusing on the tax returns would highlight the substantial mileage Movant was claiming as a business expense. Yet, the jury was already exposed to this evidence and the tax returns had net income for three of the six years that Movant was charged. Trial counsel did nothing with that evidence and presented no evidence of net income to the jury in any form.

Trial counsel appeared to understand the necessity of hiring an economic expert

relatively early in the case but failed to timely request the funds for one. While trial counsel admitted at the evidentiary hearing that he made notes in a meeting with Movant in November 2004 to obtain a financial expert, trial counsel did not file a motion to obtain funds for such an expert until February 23, 2005. That motion was denied as untimely; Movant's trial began on March 1, 2005. Prior to sentencing, trial counsel again requested funds for a CPA. The sentencing judge granted that request. At the evidentiary hearing, trial counsel admitted that the CPA's work on Movant's case was helpful. (TR 101).

Trial counsel also testified at the evidentiary hearing that he understood by November 2004 that Movant's income from commissions on renewal health insurance policies may not count toward his net income for determining benefit eligibility. While trial counsel understood that argument, he could not find an answer to whether or not this residual income would count. A logical starting point for finding an answer on residual income would have been contacting an expert in social security. Trial counsel testified that he researched the issue and talked to other criminal lawyers but he did not contact anyone in the SSA at any point in his preparation of Movant's trial.

Trial counsel's deficient representation is also evident from his interactions with the trial judge. The trial judge reprimanded trial counsel numerous times for various failures in his trial preparation. Trial counsel admitted before jury selection that he had only reviewed three fourths of Movant's file that was available at the OIG. At the evidentiary hearing, trial counsel suggested that he reviewed all the pertinent documents and purposefully did not review irrelevant videotapes. In the trial transcript, trial counsel did not make this distinction but rather, informed the trial court that he had only reviewed three quarters of the information available at the OIG. The file at OIG contained evidence critical to the case including the documents and other evidence taken from Movant's home when the OIG executed its search warrant. According to the testimony of the OIG agent involved in the search, the documents taken from Movant's home numbered hundreds or thousands of pages in length. Included in the documents were three years of tax returns, various receipts for business expenses, and evidence regarding Movant's credibility. It is unclear whether trial counsel missed any

critical documents by reviewing only three quarters of the documents at OIG.

Trial counsel also failed to timely provide a witness list and exhibit list before the start of trial. Counsel claimed difficulties with Movant and computer glitches slowed his ability to provide these lists. For his lack of preparation and mistakes during trial, the trial judge told trial counsel she intended to issue a written order to show cause against trial counsel. It appears from the docket that this order to show cause did not issue. Yet, the trial judge's frustration with trial counsel was evident.

The testimony and criminal docket also show that trial counsel did little aside from his own research and discussion with other lawyers to understand the SSA's eligibility requirements for benefits. Trial counsel admitted that he never talked to anyone from SSA and that he never had his investigator talk to anyone from SSA. At the evidentiary hearing, trial counsel testified that he talked to other criminal lawyers but he did not testify that any of these lawyers had experience in social security fraud cases. Eligibility for social security disability is a complicated determination. Based on the testimony at the trial and further testimony at the evidentiary hearing, it is clear that the SSA does not quickly take away a beneficiary's right to benefits. Understanding the process of losing eligibility was critical to the defense of Movant's case.

When a self-employed person earns more that a specified amount of net income in a given month, that person enters a trial work period. Both the social security expert at trial and the one at the evidentiary hearing testified that the trial work period is nine months during which a beneficiary can earn more than substantial gainful activity and still receive benefits. After the beneficiary's trial work period expires, the beneficiary enters an "extended period of eligibility". Both the social security experts also testified about the three month grace period, which is included in the extended period of eligibility. During that time, a beneficiary can still earn more than substantial gainful activity and receive benefits. After that three month period, a beneficiary still has thirty-three months in extended eligibility in which they can still receive benefits in any month the beneficiary does not earn substantial gainful activity. Trial counsel never talked to anyone at the SSA. It is not clear that trial

counsel ever understood the system of eligibility and he never presented this system of eligibility to the jury.

Trial counsel's failure to present net income prevented trial counsel from arguing about Movant's eligibility. Because trial counsel never showed any monthly net income for Movant he could not show where in the eligibility system Movant could be located at a given month in the time he was charged (August 1996 through July 2002). Thus, the trial work period and period of extended eligibility were not accounted for in determining Movant's eligibility.

Trial counsel continued to have difficulties at sentencing. Three sentencing hearings were held before Movant was finally sentenced because trial counsel sought continuances and filed an untimely motion for reconsideration of the court's denial of a motion for new trial and untimely objections to the presentence report. Because of trial counsel's late filing of objections to the presentence report and his untimely motion for reconsideration, the trial judge set a hearing to determine if sanctions would be imposed.

After reviewing the trial transcripts and holding the evidentiary hearing, this Court finds that Movant has satisfied the first prong of *Strickland*. Trial counsel's performance fell outside the wide range of professionally competent assistance. Trial counsel had significant life crises he was addressing while litigating Movant's case and his lack of preparation and untimeliness in many of his filings is indicative of the distraction.

The case against Movant centered on Movant's alleged taking of disability benefits to which he was not entitled because he was substantially gainfully employed. The SSA determines whether a self-employed beneficiary is substantially gainfully employed based on monthly net income and monthly hours worked. Trial counsel did very little to determine the amount of Movant's net income for the months in question. Trial counsel did not provide any evidence of net income to the jury. Trial counsel did not argue to the jury whether or at what point the trial work period or period of extended eligibility applied because he never determined Movant's monthly net income for August 1996 through July 2002. These were critical errors that should not have occurred with professionally competent assistance.

*Prejudice*

Movant argues the testimony of a CPA would have had a reasonable probability of influencing the outcome of trial and that trial counsel should have asked for a jury instruction or motion for election on the theory for the jury's determination of Movant's guilt.

### 1. The Use of an Economic Expert at Trial

It is a significant error that trial counsel did not employ an economic expert to help him understand the case and to help explain the case to the jury. This case was all about economics. The two counts with which Movant was charged involved elements of Movant taking benefits from the SSA when he knew that he was not entitled to those benefits. Whether or not Movant was entitled to benefits depended on his net income and the hours he worked each month. Trial counsel had never defended or even prosecuted a social security fraud case. He did not know about the social security eligibility system and he was not trained as a certified public accountant. Trial counsel employed no qualified person to help him determine what Movant's net income actually was.

Trial counsel testified at the evidentiary hearing that it was his trial strategy to argue generally that the Government did not prove net income and therefore, did not satisfy its burden of proof. Trial counsel testified that he chose not to show Movant's net income because it would have emphasized that Movant was driving thousands of miles a year for business purposes and that the jury would conclude that Movant was working too many hours.

This Court is not convinced that trial counsel's decision was strategic. Perhaps the most compelling reason to conclude that the decision was not strategic is that trial counsel requested funds for a CPA to help him present the case to the jury. He just made that request less than a week before trial and it was denied as untimely. He also testified at the evidentiary hearing that he tried to figure out Movant's net income. He just failed to request help from a qualified source (a CPA) and failed to request documentation from reliable sources such as the IRS and the SSA. He also failed to use the three tax returns discovered in Movant's house which listed net income for three of the years in question and he never

talked to anyone at the SSA to determine how disability eligibility works. Further proof that trial counsel's decision was not strategic and that it did hurt the defense is that trial counsel made a second request for a CPA before sentencing and trial counsel testified at the evidentiary hearing that the CPA's report of Movant's net income for the years in question was helpful at sentencing.

The Court has analyzed Movant's annual net income between August 1996 - July 2002 and finds the data presented by Movant at the evidentiary hearing compelling. A presentation of net income by the CPA as offered at the evidentiary hearing would have certainly impacted Movant's case. Yet, to determine if it prejudiced Movant to not present this evidence, this evidence must be considered against the circumstantial evidence presented at trial that Movant was working and Movant's testimony, which was completely incredible. Given all the evidence, it is a close call whether trial counsel's deficient performance affected the outcome of Movant's case. This Court is not convinced that Movant's conviction would be different. The evidence, even the CPA's presentation of net income, suggests that Movant took some amount over a thousand dollars in unentitled benefits. Movant was not prejudiced by the jury finding that he knowingly took disability benefits in excess of a thousand dollars when he was not entitled to those benefits. The Court, however, is concerned that the loss amount assessed against Movant would have been much less if trial counsel performed competently.

The testimony of a CPA for Movant clearly would have struck a blow to the Government's case. The Government's case against Movant had serious weaknesses. Particularly weak to this Court was the Government's presentation of only annual gross income at trial when Movant's eligibility for benefits, per the SSA regulations, is determined by monthly net income. The Government's witnesses also presented as inexperienced. The Government's OIG agent was four months out of training and by his own testimony, he was still learning the social security programs. He testified that even though he knew Movant's net income was available on the SSA's mainframe computer, he did not copy that information into Movant's file nor include it in his investigation. He testified that he was

focused on Movant's gross income. Likewise, the Government's CPA testified that he considered only gross income and that his analyses did not include business receipts or expenses, nor did he distinguish between new insurance commissions and renewal commissions.

The Government's case rested primarily on general assertions that Movant was earning more money than permitted under the regulations. It presented only limited circumstantial evidence that Movant may have been working too many hours based on business mileage he claimed on 1997, 1998 and 1999 tax returns. The Government did not address if and when Movant entered into a nine month trial work period as permitted by the SSA regulations. The Government also did not address if and when Movant entered into the thirty-six month extended period of eligibility.

If Movant's trial counsel had obtained an economic expert, like Mr. Gard, to explain net income and the SSA's eligibility system, such testimony would have deflated the Government's case. A look at Movant's net income provides compelling evidence that Movant was within eligibility limits for at least some of the months in the six year period during which the Government claimed he was ineligible. Presenting Movant's net income also would allow Movant's trial counsel to show how the trial work period and the extended period of eligibility applied, keeping Movant eligible for some more of the months during which he was charged.

The following paragraphs analyze the financial data presented by the Government and by the Movant's CPA. The Government's evidence of Movant's gross income included two separate schedules. The first schedule of Movant's gross income was based on commission statements found in Movant's home. The second schedule was created from subpoenaed earnings statements from the various insurance companies for whom Movant worked. At sentencing and at the evidentiary hearing, Movant presented information on his net income. The schedule developed by Movant's CPA, Gary Gard, is based on Movant's net income as it was reported from the IRS to the SSA for the six years in question. The three charts below summarize the information presented by the Government and Movant's CPA:

1. Insurance Commissions based on Documents Seized from Movant's House

| Date | Annual Commissions | Monthly Average |
|------|-------------------|-----------------|
| 1996 | $14,700.87 | $1,225.01 |
| 1997 | $16,431.77 | $1,369.31 |
| 1998 | $31,843.57 | $2,653.63 |
| 1999 | $38,416.92 | $3,201.41 |
| 2000 | $34,214.27 | $2,851.19 |
| 2001 | $38,996.63 | $3,249.72 |
| 2002 | $2,698.78 (Jan only) | |
| Total | $177,653.77 | |

2. Commissions based on Subpoenaed Earnings Statements from Insurance Companies

| Date | Annual Commissions | Monthly Average |
|------|-------------------|-----------------|
| 1996 | $14,295.95 | $1,191.33 |
| 1997 | $16,255.96 | $1,354.66 |
| 1998 | $30,388.71 | $2,532.39 |
| 1999 | $43,257.71 | $3,604.81 |
| 2000 | $38,110.25 | $3,175.85 |
| 2001 | $41,473.04 | $3,456.09 |
| 2002 | $35,433.84 | $2,952.82 |
| Total | $219,215.45 | |

3. Net Income Based on CPA Gary Gard's Schedule, Derived from Data IRS Gives to SSA

| Date | Annual Net Income | Monthly Net Average | Annual Net Minus Residual[1] |
|------|-------------------|---------------------|------------------------------|
| 1996 | $1,584.00 | $132.00 | No residual |
| 1997 | $1,607.00 | $134.00 | Zero (Residuals=$2,960.00) |
| 1998 | $9,734.00 | $811.17 | Zero (Residuals=$12,459.00) |
| 1999 | $7,874.00 | $656.17 | Zero (Residuals=$12,996.16) |
| 2000 | $1,480.00 | $123.33 | Zero (Residuals-$5,147.00) |

---

[1] This column is significant only if income from renewals of health insurance policies are "residual income" that should not be included in Movant's net income to determine his eligibility for benefits. The Court will address this issue <u>infra</u>.

| 2001 | -$435.00 | Zero | Zero (Residuals=$978.00) |
| 2002 | $20,969.00 | $1,747.42 | ? |

The difference between Movant's gross income and net income for the time period in question is significant. Movant's CPA derived his numbers from the IRS. These are the numbers that the IRS sends to the SSA as proof of a beneficiary's net income. Movant's CPA inquired with the IRS and found no evidence that the IRS disbelieved that the numbers it reported to the SSA were an accurate picture of Movant's net income. The IRS was not auditing Movant. Outlined in the above charts, Movant's net income presents a compelling argument that he was not in violation of the eligibility requirements for the entire duration of the time charged by the Government. There is a reasonable probability that the chart on Movant's net income would have affected Movant's case.

Based on the net income data presented by Movant's CPA, there's a reasonable probability the jury would have drawn a number of conclusions. First, Movant was not making more than the allowable amount in 1996 or 1997. Thus, the disability benefits Movant received from August 1996 through December 1997, a total of seventeen months, should not have been included against him. Recall that the Government charged him with taking benefits to which he was not entitled from August 1996 through July 2002.

Second, based on the testimony of both the social security expert at trial and the one at the evidentiary hearing, when Movant began earning more money than allowed in 1998, he entered a trial work period. That period is nine months. During that nine month period, a beneficiary is entitled to receive benefits even though they are earning above the allowable amount. Immediately after Movant exhausted his trial work period, he entered into a thirty-six month extended period of eligibility. The first three months of extended eligibility are a grace period in which a beneficiary is still entitled to benefits even if they are substantially gainfully employed. So, in 1998, Movant spent twelve months earning substantial gainful activity and used his nine month trial work period and his three month grace period of the extended eligibility. Given the trial work period and the grace period of extended eligibility, Movant was still entitled to benefits in 1998.

Based on the net income, there is a reasonable probability that the jury could have concluded that 1999 is the first year that Movant is receiving disability benefits to which he is not entitled. As discussed supra., Movant is in his thirty-six month extended period of eligibility and January 1999 begins month four of that period. During this time, any month in which Movant does not earn substantial gainful activity, he is still entitled to receive disability benefits.

For the year 1999, the SSA defines substantial gainful activity as $500 per month. If residual income is included as part of Movant's net income[2], then Movant is defrauding the SSA for all twelve months of 1999. At the conclusion of 1999, fifteen months of Movant's thirty-six month period of extended eligibility have expired.

In 2000, Movant is still in his extended period of eligibility and based on his net income he is now earning $123.33 per month. Per statute, Movant is entitled to receive benefits while in the extended period of eligibility in the months when he does not earn substantial gainful activity. Therefore, Movant is entitled to receive benefits in this year. At the end of 2000, twenty-seven of Movant's thirty-six months of extended eligibility have expired.

Beginning in January 2001, Movant has nine months remaining in his extended period of eligibility. His net income, as report by the IRS to the SSA shows that Movant earned -$435.00 and therefore "zero" in net income. Thus, Movant would then be entitled to receive benefits through September under his final nine months of extended eligibility. He would not be entitled to the remaining three months.

The Government charged Movant with accepting benefits in the first seven months of 2002. During that time his monthly net income was above the allowable limit and he would not be entitled to benefits.

Of the six years the Government charged Movant with taking benefits to which he was

---

[2] This Court will address Movant's argument that income from renewals of health insurance policies are "residual income" that should not be included in his net income to determine his eligibility for benefits infra.

not entitled, an analysis of net income would likely show that Movant received benefits to which he was not entitled for one year and ten months. He was not entitled to benefits for all of 1999, the last three months of 2001 and the first seven months of 2002. The above analysis would not change Movant's conviction. Movant was convicted of knowingly stealing government money, specifically social security disability benefits, in excess of $1000. If residual income is included in the analysis of Movant's income, even with the CPA's testimony on net income, Movant would have taken more than $1000 in benefits to which he was not entitled in 1999.

The information on net income, however, could have substantially changed the outcome of Movant's sentence. Movant was subject to an eight-level enhancement of his sentence because the sentencing judge found an amount loss greater than $70,000. Guideline § 2B1.1 (b)(1)(E). Movant was also required to pay restitution of $88,800.70 based on the loss amount.

While Movant's trial counsel requested and the sentencing judge granted a motion for a CPA, no testimony was presented to the jury or the sentencing judge about Movant's net income nor how that net income effected Movant's trial work period and extended period of eligibility. Trial counsel only submitted a chart of Movant's net income that was created by the CPA. The sentence enhancement and restitution amount could have been substantially reduced if Movant's counsel presented the CPA to show Movant's net income.

The sentencing judge did adjust Movant's sentence because the Government failed to prove that Movant exhausted his trial work period prior to August 1996. The Government alleged a loss amount of $101,222.70 based on the benefits Movant and his daughter received in the six years between August 1996 and July 2002. The sentencing judge reduced the loss amount by nine months; therefore, crediting Movant a trial work period.

If Movant's trial counsel had presented a CPA to the jury and the sentencing judge, there is a reasonable probability that the extended period of eligibility, including the three month grace period, would have been considered in addition to the trial work period. Movant was sentenced based on taking benefits to which he was not entitled for five years and three

months. If the extended period of eligibility was considered, he would have been sentenced based on taking benefits to which he was not entitled for one year and ten months - a significant and prejudicial difference. Rather than owe $88,800.70, he would owe $30,929.16.[3]

While the financial data presented by the CPA at sentencing and at the evidentiary hearing is compelling, it must be considered in light of the other circumstantial evidence and Movant's testimony. The Government presented circumstantial evidence that Movant was working. There are two reports from outside sources to the SSA that Movant was working. At least one of those reports, however, is determined to be a personal attack on Movant by his former father-in-law. The other circumstantial evidence is analyzed with the Movant's credibility.

Movant's credibility is a severe weakness in his case. The information he provided to the SSA when it inquired into his work is, at best, confused. For example in 1998, the year in which Movant is earning $811.17 a month by his CPA's calculations, he informs the SSA that he can only make one insurance call a week and that he is earning $150 net income per month for the first six months of 1998. His 1998 tax return also shows he claimed 25,650 miles driven for business that year. In 2001, Movant is again asked about his income from 1998. This time he reported earning between $600 to $650 per month, with $2800 in December. Movant's changing disclosure of his income to the SSA was likely damaging at trial and would still be damaging even with the CPA's net income. Although, the defense could have argued that net income for a self-employed person is difficult to determine until the person completes their taxes and determines income after business expenses. So, some adjustment in income reporting may be reasonable. Also, even based on the CPA's chart, Movant was earning substantial gainful activity in 1998 and 1999. Thus, the fact that Movant reported inconsistent income in 1998 may not have mattered to the jury or at

---

[3] The loss amount for the six years or seventy-two months was $101,222.70. Divide the $101,22.70 by 72 months for a total of $1,405.87/month. Multiply the $1,405.87 by the twenty-two months Movant was not entitled to receive, which results in $30,929.16.

sentencing.

Also damaging to his case, Movant's tax returns show that he is driving in excess of sixteen thousand miles in 1997 and in excess of twenty-five thousand miles in 1998 and 1999. This suggests that Movant was working too many hours but, again, at least with 1998 and 1999, Movant was already in violation even by his CPA's analysis of net income.

In addition to the driving miles, the Government showed other evidence of Movant's allegedly working more than he was permitted. The Government showed evidence of a shaving products business owned by Movant and an advertisement for that business claiming that the business made annual sales over $18,000 in 1998, over $15,000 in 1997 and over $5,000 in 1996. Aside from this advertisement, no other evidence suggests this business was successful or made any money. The Government also presented the demand letter discovered in Movant's home in which Movant demanded money for working over fifty hours a week for seven weeks in 1994. This letter was for work allegedly completely in 1994, outside the time period in which the Government claimed Movant was ineligible for benefits, but it is circumstantial evidence that he was working.

Movant's testimony at trial was an unmitigated disaster. Regarding the shaving products business, Movant testified that he knew nothing about the advertisement and denied preparing or helping prepare the advertisement. The advertisement was found in a search of Movant's home and it was for a business that Movant owned. It would stretch any reasonable thought process to believe that it did not belong to him. Movant explained the business lost money but he also claimed that a friend ran the business for him. On cross, he admitted that all the financial accounts for the business were in his name and that checks were written to him.

Further damaging his credibility, the prosecutor asked Movant about the demand letter and Movant claimed that he did none of the work claimed in the letter. Rather, he testified and that the private investigator to whom he was allegedly employed was willing to pay Movant for thinking about marketing while he was asleep. Movant denied filing a lawsuit to recover payment for the work but admitted on cross that a friend filed a lawsuit on his

behalf. On cross, the Government also pointed out that in a bankruptcy filing in 2000, Movant claimed a net monthly income of $5000. Responding, Movant stated his attorney completed the paperwork and that even though Movant signed the filing, it was not a correct figure of his income.

Movant also testified incredibly about his insurance sales business. He claimed that his disability limited him to having one client per week from 1995 to 2001. On cross the Government showed Movant a letter in which Movant claimed to have "thousands" of clients and to be identified as having sold more medical savings accounts that any other agent. Movant claimed he did not write the letter and that he "kind of" read it before he signed it. He also claimed he had *potential* clients in the thousands but not actual clients.

Because Movant put his credibility at issue, the Government was able to tell the jury that Movant was convicted in 2001 of impersonating a federal officer. Movant also claimed to write a letter to the SSA on May 1, 1996 inquiring about maintaining his eligibility for benefits. Through the testimony it was clear that Movant never sent such a letter to the SSA and likely wrote the letter after the SSA contacted him about working. It was May 11, 1996 that the SSA contacted Movant about a report that he was working. The SSA expert testified that the letter of May 1, 1996 described by Movant was not found in his file, suggesting the SSA never received such a letter. On cross Movant also admitted that when the SSA contacted him on May 11, 1996, he did not discuss with the SSA representative any information he put in the letter or inform the representative that he had allegedly sent a letter.

The decision by Movant's counsel not to employ an economic expert was a critical error. The central component of a defense had to be determining Movant's monthly net income between the months of August 1996 through July 2002. Still, it seems unlikely that a CPA's testimony could have changed the outcome of Movant's conviction. Certainly there is not a reasonable probability that it would have changed the outcome of his conviction. Even based on the testimony of Movant's CPA at sentencing and the evidentiary hearing, Movant still earned more income than permitted in at least some of the months in question. The Government only had to prove he knowingly took benefits to which is was not entitled

to receive in excess of a $1000. There is not a reasonable probability that the jury's determination would have changed on the actual conviction.

What concerns this Court is the total failure at trial to have the jury determine how much money the Movant actually stole. The Government argued it was over $100,000, but it provided only evidence of annual gross income. Per the SSA regulations, Movant's eligibility is based on monthly net income. The evidence offered at the evidentiary hearing shows a substantial difference between gross and net income for Movant. Also, losing eligibility for benefits is a gradual process that includes a trial work period and an extended period of eligibility. If Movant's trial counsel had shown Movant's monthly net income, the jury and sentencing judge could have determined at what point Movant earned more income than allowed, entered a trial work period, entered an extended period of eligibility, and finally, became no longer eligible for benefits. The CPA's data must be weighed against the other circumstantial evidence and Movant's complete lack of credibility. In spite of Movant's incredible testimony and given the weakness of the Government's case in proving only annual gross income, this Court recommends that the District Court uphold Movant's conviction but vacate Movant's remaining supervised release and recalculate his restitution.

**Residual Income**

In addition to the general failure to hire a CPA for this case, Movant argues his trial counsel was ineffective in failing to have a CPA explain residual income and Movant's theory that residual income should not be included as part of his net income. To Movant, residual income includes commissions he received when his clients renewed their health savings accounts. At trial and the evidentiary hearing, Movant testified that the renewing of health savings accounts required no work from him. Unlike life insurance policies or other types of insurance, medical privacy rights prevented him or any other insurance agent from helping clients renew health savings accounts. Clients, instead, worked directly with insurance companies to renew those accounts. Movant testified that he received the commissions based on renewals of health savings accounts automatically and the selling of the original account was the only work, a one-time work event, that he did for the income.

Because it was a one-time work event Movant argues his trial counsel should have employed a CPA to explain that this residual income should not be included in determining Movant's net income.

For its part, the Government argues that as a matter of law commissions from renewals of health savings accounts are not residual income and would be included in an analysis of Movant's net income. The social security expert who testified at the evidentiary hearing stated that income from renewal of health savings accounts would be included as income. The Government also offered Social Security Rule 71-22 and the Social Security Administration Program Operations Manual RS 02505.170 (How to Treat Repeat Commissions on Casualty Insurance) as proof that the SSA includes these commissions in its net income analysis.

There are multiple problems with the residual income argument for both Movant and the Government. The Government's position is problematic because it cannot be said as a matter of law how the SSA determines commissions from renewal of health savings accounts. The regulations presented by the Government are not entirely on point. SSR 71-22 is a regulation addressing the renewal of life insurance policies. Movant was selling health savings accounts. These are different products and require different work in the renewal process. In fact, footnote one of SSR 71-22 states "[t]his ruling does not apply to ... commissions from the sale of other types of insurance..." SSR 71-22, fnte 1. Furthermore, this regulation applies to old-age insurance beneficiaries, not beneficiaries of disability insurance. SSR 71-22. The second regulation cited by the Government addresses health insurance but not specifically health savings accounts and again, it applies to old-age beneficiaries, not disability beneficiaries. RS 02505.170 (How to Treat Repeat Commissions on Casualty Insurance). Furthermore, while the social security expert at the evidentiary hearing testified that in her experience she applied regulations governing old-age insurance to disability insurance, she admitted there was no ruling that expressly permits such an application.

Also problematic for the Government was the testimony of its social security expert

at trial. At trial, defense counsel explained its theory of residual income, as a one-time work event, to the Government's social security expert. When Movant's trial counsel explained that the insurance agent does not have any more contact with the person regarding a health savings account, the social security expert said it sounded like that would be a one-time work event. Thus, even the Government's two social security experts, the one at trial and the one at the evidentiary hearing, disagree as to whether income from the renewals of health savings accounts would be included in assessing Movant's net income.

Movant, however, also has problems with his position on residual income. Reviewing the trial, it was a mistake for Movant's counsel not to determine whether residual income should be included in net income. Trial counsel testified that he tried to find some statute or regulation to guide him on whether residual income was included but discovered nothing. Trial counsel did not call the SSA or ask a social security expert. Likewise, trial counsel did not employ the CPA to present this theory until after trial. While it was a mistake, it is not clear that it was an error and it is certainly not clear that Movant was prejudiced.

First, even the social security experts disagree as to whether income from renewals of health savings accounts count as net income. The second and larger problem for Movant is that even if this Court were to accept his argument, the financial data he offers does not show he was prejudiced. Movant's CPA presented a chart which shows Movant receiving substantial income from the renewals of insurance policies. In 1997, he received almost $3,000 in residuals; in 1998 and 1999 he received over $12,000; and in 2000 over $5,000. This is significant income and if it is subtracted from his net income in each of those years, Movant is not earning above the allowable amount for disability benefits.

The issue for Movant is that this residual income is not accounted for in any year. At the evidentiary hearing the Magistrate Judge specifically asked the CPA that if this income was not accounted for in the year it was received, then in which year was it included as part of Movant's income? The CPA answered that it was not included in any year. The CPA did not include the residual income in any year because he could not determine in which year the SSA would have included it. While there seems to be debate within the SSA about where

this income would be included, it must be included in some year.  Not including it fails to show how Movant was prejudiced.

There is not a reasonable probability that the outcome would have been different if Movant's trial counsel had presented its residual income theory through the testimony of a CPA.   The substantial income Movant earned from alleged renewals of health savings accounts needed to be included as part of his income in some year.  If Movant's theory was that it should not be included in the year it was received, then it should have been included another year, such as the year it was earned.  Movant has not proved there is a reasonable probability that the outcome of his case would have been different if he had presented his residual income argument through the testimony of a CPA.

### 2.  Motion for Election

In his evidentiary hearing memorandum, Movant also argues that his trial counsel was ineffective for failing to move for an election to determine that the jury find him unanimously guilty because either (1) he earned too much money or (2) he worked too many hours.  (Doc 159).  Movant argues the Government presented two distinct theories to prove the two counts charged against Movant and that the jury may not have been unanimous in finding him guilty based on only one of those theories.  The Government responds that this claim should not be permitted because it was not raised in Movant's initial petition and that this claim fails as a matter of law.  The Court recommends that the District Judge find this claim fails as a matter of law.

Unanimity is required in determining that a defendant committed a substantive offense but it is not required for a particular theory of liability.  *United States v. Lyons*, 472 F.3d 1055, 1069 (9th Cir.2007).  A "general unanimity instruction suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict." *United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir.1999).  "A specific unanimity instruction is required if it appears that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts."  *Lyons*, 472 F.3d at 1068.

In this case, the act for which Movant was charged was stealing money, specifically social security benefits, from the Government. The Government charged Movant with theft of government money or property in violation of 18 U.S.C. § 641 and social security fraud in violation of federal law. For the first count, the Government had to prove (1) that defendant stole money or property of value with the intention of depriving the owner of the use or benefit of the money or property; (2) the money or property belonged to the United States; (3) the value of the money or property was more than $1000. For the second count, the Government needed to prove (1) defendant had knowledge of an event affecting his right to receive or to continue to receive social security disability insurance benefit payments; (2) defendant knowingly concealed or failed to disclose this event to the Social Security Administration; (3) defendant concealed or failed to disclose this evidence to the Social Security Administration with the intent to fraudulently secure payment of social security income benefits in an amount greater than was due him, or when no payment to him was due him or when no payment to him was authorized. The jury was not required to be unanimous on whether Movant stole the social security benefits by earning too much money or working too many hours. How he stole the money is a preliminary factual issue not requiring unanimity. *Schad v. Arizona*, 501 U.S. 624, 631-632 (1991) (no general requirement that jury reach agreement on preliminary factual issues underlying a verdict). The Magistrate Judge recommends the District Court, after its independent review, deny Movant's petition on this claim.

**Recommendation**

The Court recommends that the District Judge, after his independent review, DENY in part and GRANT in part Movant's claim of ineffective assistance of trial counsel in his amended habeas petition. There is a reasonable probability that the outcome of Movant's sentence, but not conviction, would have been different if Movant's trial counsel had presented the testimony of a CPA. This Court recommends that the District Court uphold Movant's conviction but vacate Movant's sentence and resentence him.

Pursuant to this Court's Order dated February 3, 2009 (Doc 64), the fourteen day time

limit to file objections to a magistrate judge's report and recommendation shall be extended. Counsel for both parties shall have thirty days to file objections to the recommendations of this Court on all seven grounds. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: cv-08-077-DGC.

DATED this 3rd day of March, 2010.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE